UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
In re: :
: Chapter 11
M. FABRIKANT & SONS, INC., *et al*., :
: Case No. 06-12737 (SMB)
:
Debtors. : (Jointly Administered)
---------------------------------------------------------------X

# DECLARATION OF MICHAEL A. O'HARA IN SUPPORT OF CONFIRMATION OF JOINT PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

I, Michael A. O'Hara, hereby declare, pursuant to section 1746 of title 28 of the United States Code, the following to be true to the best of my knowledge, information and belief:

1. I am President of Consensus Advisors LLC ("Consensus"). Consensus was retained as the financial advisor to the Official Committee of Unsecured Creditors (the "Committee") in the bankruptcy cases of M. Fabrikant & Sons, Inc. ("MFS") and Fabrikant-Leer International, Ltd. ("FLI", and together with MFS, the "Debtors").

2. I submit this Declaration in support of the Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code, dated November 7, 2007 (as may be modified, amended and/or supplemented, the "Plan").

3. I am familiar with the terms and conditions of the Plan and the Third Amended Disclosure Statement for Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code of the Official Committee of Unsecured Creditors, the Debtors' Current Lenders, Wilmington Trust Company, as Agent to the Current Lenders, and the Debtors (the "Disclosure Statement"), having participated in the negotiation and development thereof. Unless otherwise noted, I have

personal knowledge of the facts set forth below, and if called as a witness I could and would competently testify to the matters set forth in this Declaration.

**Plan Settlement**

4. Throughout these cases, the Committee has faced the prospect of little or no recovery for unsecured creditors. Indeed, in their "first day" papers, the Debtors stated that they had approximately $162.0 million in secured debt senior to the claims of the general unsecured creditors. Reasonable estimates of the Debtors' hard assets (principally inventory and receivables) implied that there would be no recovery beyond the amounts needed to satisfy such secured debt. This appeared to be proven out when each of the Original Banks[1] sold their claims for, upon information and belief, less than 60 percent of the face value of such claims less than two months after the Petition Date.

5. Before the Petition Date, the Debtors obtained their principal financing from the Original Lenders pursuant to eight separate bilateral loan agreements, which were allegedly secured by substantially all of the assets of the Debtors. Shortly after the Petition Date, the Debtors and the Original Lenders entered into an agreement to continue to fund the Debtors' business, which agreement was embodied in the Final Order Authorizing Debtors' Use of Cash Collateral and Granting Adequate Protection Claim and Lien (the "Final Cash Collateral Order"), which was approved by the Court on December 18, 2006.

---

[1] Prior to the petition date, the Debtors' retained the investment banking firm of Peter J. Solomon & Co. ("PJS") to market the Debtors' businesses and assets to third parties. I understand that approximately 100 parties were contacted by PJS about their possible interest in a transaction. At the conclusion of the PJS marketing effort, the Debtors conducted an auction under Section 363 of the Code and sold their assets. Though I understand that final downward purchase price reconciliation negotiations are ongoing, the highest bids received, when coupled with cash proceeds from the sale of other assets of the Debtors prior to the auction in the ordinary course, were not even sufficient to pay down half of the senior secured debt. As such, the Current Lenders, in the absence of the Plan Settlement, would lay claim to a deficiency judgment in excess of $80 million. Accordingly, I believe that the unsecured creditors would have received no recovery from these assets in the absence of successful litigation against the Current Lenders or a settlement such as the Plan Settlement.

6. The Final Cash Collateral Order authorized the Debtors to use Cash Collateral (as such term is defined in the Final Cash Collateral Order) in accordance with the terms and conditions of the Final Cash Collateral Order through and until the close of business on March 16, 2007. It also, among other things, gave the Original Lenders an adequate protection claim, to protect the Original Lenders' interests in their collateral, in the form of a valid, binding, enforceable and automatically perfected first priority lien on all of the Debtors' assets. Critically, as part of the Final Cash Collateral Order, the Debtors conceded to, and agreed not to challenge, the validity, extent, priority, perfection, enforceability and non-avoidability of the prepetition liens granted to the Collateral Agent and Original Lenders.

7. The Final Cash Collateral Order did, however, allow the Committee to commence an adversary proceeding within one hundred twenty (120) days of appointment of the Committee to, among other things, challenge the validity, extent, priority, perfection, enforceability and non-avoidability of the prepetition liens granted to the Collateral Agent and the Original Lenders (the "Challenge Period"). Through various stipulations entered into among the Committee, the Original Lenders and the Current Lenders, and approved by the Court, the Challenge Period was extended to October 1, 2007. By agreement, the Challenge Period has been extended as to the Current Lenders to a date after the hearing to confirm the Plan (in the event the Plan is not confirmed).

8. Since its appointment, the Committee, through its professionals, conducted extensive investigations into transfers made by, and the conduct and actions of, certain of the Debtors' insiders and affiliates and the role the Original Lenders had in facilitating such transfers, conduct and actions. In light of these investigations, the Committee commenced an action against the Original Lenders in this Court seeking to recover funds amounting to

approximately $118 million.

9. It is possible that the Committee could have also brought similar actions against the Current Lenders as successors in interest to the Original Lenders. In extensive discussions with the Current Lenders' professionals, however, the Current Lenders vigorously opposed the Committee's contention that such successor liability existed to reduce the Current Lender Claims, alter the priority of any portion of the Current Lender Claims, or avoid the liens and security interests securing the Current Lender Claims.

10. As I understand it, the Current Lenders relied, at least partially, on the notion that they acquired their claims without knowledge of any wrongful acts of the Original Lenders and therefore would be entitled to holder-in–due-course status. I am advised by counsel that the law regarding this defense in the Second Circuit was unsettled at the time of our settlement discussions and remains unsettled.

11. To avoid an expensive and time-consuming litigation, the Committee, the Current Lenders and Wilmington, through their professionals, entered into extensive negotiations to resolve the Committee's potential claims against the Current Lenders. The result of these negotiations is reflected in the Plan Settlement.

12. From the perspective of unsecured creditors, key features of the Plan Settlement include:

(a) The unsecured creditors will share, along with the Current Lenders, in the proceeds of certain assets otherwise considered the collateral of the Current Lenders, such as the Other Lender Collateral and will similarly share in any recovery on the Fortgang Guaranties, which belong exclusively to the Current Lenders;

(b) The unsecured creditors will share, along with the Current Lenders, in the

proceeds of litigation judgments and settlements brought against insiders and third parties who have injured the estate or who were the recipients of avoidable transfers, and the pursuit of these actions will be funded with cash that would otherwise be deemed to be the cash collateral of the Current Lenders;

(c) Any recovery by the GUC Trust on account of the Original Lender Litigation Claims will not be shared by the unsecured creditors with the Current Lenders, who, absent the Plan Settlement, would likely have had a sizeable unsecured deficiency claim;

(d) Indeed, the Current Lenders have agreed to waive the right to assert an unsecured claim against the assets of the GUC Trust in respect of any unsecured deficiency claim they may ultimately have. I understand that the Current Lenders currently have a deficiency claim of greater than $80 million;

(e) The Shared Asset Trust waterfall protocol allocates the first five million dollars ($5.0 million) of distributable monies recovered by the Shared Asset Trust to the GUC Trust.[2] This priority of payment was an important feature of the Plan Settlement to the Committee;

(f) In addition, the Shared Asset Trust will contribute $500,000 to the GUC Trust to fund the reconciliation of disputed unsecured claims. I believe this is also a critical feature to unsecured creditors, as a significant number of unsecured claims have been filed in these cases that were not previously identified by the Debtors or were identified as unliquidated, contingent or disputed. Additionally, several of the Debtors'

---

[2] A hearing to approve a settlement with the Estate of Philip Hahn and Irving Rosenzweig is scheduled for December 18, 2007. No objections to the settlement have been filed and the deadline to do has passed. Assuming the settlement is approved, it is anticipated that the settlement proceeds will be sufficient so that the Shared Assets Trust and the GUC Trust will have funding and the holders of Class 4 and Class 5 Claims will receive immediate and meaningful distributions under the Plan.

affiliates have asserted claims or are listed as being owed scheduled amounts which the Committee has challenged, or which the GUC Trustee may wish to challenge (collectively, "Disputed Claims").

13. In light of the original prospects for recovery for the unsecured creditors, I believe the Plan Settlement offers the following meaningful benefits to unsecured creditors:

(a) the ability to pursue the Original Lender Litigation Claims without diluting unsecured creditor recoveries with the potentially sizeable unsecured deficiency claim of the Current Lenders;

(b) in light of a recent settlement with the estate of a former insider, a nearly guaranteed recovery of up to $5.0 million. I believe surety of collection of this sum is very meaningful as there are no guarantees that the GUC Trust will be able to prevail on the Original Lender Litigation Claims or will receive any subsequent distributions from the Shared Asset Trust;

(c) funding to permit the GUC Trust to oppose, if appropriate, the potentially significantly dilutive Disputed Claims; and

(d) the ability to share in future upside if the Shared Asset Trust is able to successfully prosecute litigation and recovery actions or collect on certain accounts receivable.

14. Moreover, I believe that, in light of the risk that the Current Lenders might have valid defenses not available to the Original Lenders, it would not have been prudent to put all of the unsecured creditors' "eggs in one basket." I believe the Plan Settlement eliminates these risks while simultaneously preserving for the benefit of unsecured creditors largely identical claims against the Original Lenders that are subject to fewer defenses. I am advised by counsel

that if these Original Lender claims are successfully pursued, the GUC Trust may be able to make distributions sufficient to satisfy the great bulk of the allowed claims of the Debtors' general unsecured creditors. Based on the foregoing, I supported granting the Current Lenders and Wilmington the releases set forth in the Plan as part of the basket of consideration offered in the Plan Settlement, and I believe the Plan Settlement is in the best interests of the Debtors' general unsecured creditors.

**The Plan Was Proposed in Good Faith**

15. As set forth above, the Plan Settlement, which is the foundation for the Plan, was the product of extensive and arms-length negotiations between the Committee and the Current Lenders. Following their review of the Plan Settlement and a draft of the Plan, the Debtors joined the Committee and the Current Lenders as co-proponents of the Plan. As a result, the Plan is being jointly proposed by the Debtors, the Current Lenders and the Committee.

16. The Plan has been proposed by such parties in good faith and with the legitimate and honest purpose of liquidating the Debtors' remaining assets and providing for the orderly distribution thereof to all holders of Allowed Claims. As such, the Plan complies with section 1129(a)(3) of the Bankruptcy Code.

**"Best Interests" Test**

17. I believe unsecured creditors would likely have a much bleaker outcome if the Plan Settlement is not approved, and I believe risk-weighted recoveries for unsecured creditors under the Plan are meaningfully better than they might be under a Chapter 7 liquidation.

18. In light of the modest recovery on the sale of the Debtors' hard assets in this case, the Current Lenders have been left with a sizeable unsecured deficiency claim. For a Chapter 7 liquidation to provide a better recovery for unsecured creditors, a Chapter 7 Trustee would need

to obtain a judgment against the Current Lenders declaring that successor liability exists to reduce the Current Lender Claims, alter the priority of any portion of the Current Lender Claims, and/or avoid the liens and security interests securing the Current Lender Claims. I understand that there are procedural and monetary impediments to a Chapter 7 Trustee's ability successfully to bring such claims, and there are surety of recovery and time value of money considerations, as well.

19. Preliminarily, I have been advised that, if the Plan Settlement is not approved and the cases are converted to Chapter 7, the Committee will be disbanded and a Chapter 7 Trustee (or two) appointed.[3] Such a Chapter 7 Trustee would not have the benefits of the deal embodied in the Plan Settlement, and there are no assurances that he or she could negotiate the same or better deal. Indeed, a Chapter 7 Trustee may not have adequate leverage to exact such a settlement for the reasons set forth below.

20. A Chapter 7 Trustee may not be procedurally entitled to challenge the Current Lenders' liens and priority status. As I understand it, all parties except the Committee have waived their rights to challenge the Current Lenders' claims and liens. I do not know whether a Chapter 7 trustee would be able to inure to the Committee's rights to so challenge the Current Lenders' priority status and liens and, in any event, could be prepared to levy such a challenge within the limited time available to do so under the current extension of the Committee's rights under the Final Cash Collateral Order.

21. A Chapter 7 Trustee would have to work within the $35,000 professional fee "carve-out" limitation set forth in the Final Cash Collateral Order. In light of the complex facts

---

[3] I understand that a committee of creditors may seek to be appointed under section 705 of the Code but that such a committee would not necessarily consist of the same members as the Committee. I am advised by counsel that the powers and responsibilities of a chapter 7 committee differ from those of a chapter 11 committee. Based on these and other reasons, I understand from counsel that the Original Lenders and the Current Lenders would likely contend that the chapter 7 committee did not succeed to the rights that the Final Cash Collateral Order granted to the existing chapter 11 Committee.

and defenses associated with the potential claims against the Current Lenders, this sum may well prove inadequate.  Further, there can be no assurance that a Chapter 7 Trustee would be able to attract attorneys to take the case against the Current Lenders on a contingency basis.  While the Committee has successfully attracted attorneys to sue the Original Lenders on contingency, the Current Lenders have similar defenses as the Original Lenders, plus possibly others such as a holder-in-due-course defense and the argument that, under the Final Cash Collateral Order, a Chapter 7 Trustee would not have the right to challenge the Current or Original Lenders' liens and priority status.  In light of the foregoing, I believe the prospect that a Chapter 7 Trustee would be able to prosecute and prevail in a suit against the Current Lenders is speculative.

22. There is no assurance that the Current Lenders would not prevail on their holder-in-due-course defense, their waiver defense based on the Final Cash Collateral Order, or other defenses in any action brought by a Chapter 7 Trustee.  If the Chapter 7 Trustee's action failed, unsecured creditors would likely recover nothing on the remaining assets allocated to the Shared Assets Trust under the Plan, including the affiliate and insider litigations and the collection of accounts receivable.

23. In such a scenario, the Current Lenders, to the extent that their senior secured debt was not satisfied by their other recoveries, would also have an unsecured deficiency claim that would dilute the recovery of other unsecured creditors in the Original Lender Litigation.

24. Moreover, absent a recovery, the Chapter 7 Trustee would have little to no funds to challenge the Disputed Claims, leaving whatever recoveries the unsecured creditors could potentially get severely (and possibly inappropriately) diluted.

25. A Chapter 7 Trustee would also burden the estate with the expense and delay associated with becoming informed on the nuances of these highly complex cases.  It is likely

that such a Trustee would need to hire new counsel and financial advisors, who would need to conduct their extensive investigations fairly promptly to ensure that appropriate actions are brought within the relevant statutes of limitations and agreed upon challenge periods (if, as discussed above, these challenge periods are applicable at all). Under the Plan, the Shared Assets Trust and the GUC Trust have the right to retain one or more professionals that have been working on these cases.

## Substantive Consolidation

26. The Plan provides that each general unsecured creditor holding an Allowed Claim against either MFS or FLI will share *pro rata* with all other holders of allowed general unsecured claims of both MFS and FLI, on a combined basis, in all distributions made from the GUC Trust. Accordingly, distributions from the GUC Trust will be made to Class 4 and Class 5 creditors as if such classes were consolidated.

27. In recognition of the historical entanglement of the businesses of the Debtors, the Plan Proponents elected to pursue a consolidated distribution to unsecured creditors of MFS and FLI after careful consideration of the practicalities of the case. I believe that, to disentangle the remaining assets and the liabilities of MFS and FLI would be, under the circumstances, very difficult, time consuming and costly -- indeed, so costly as to possibly exhaust a meaningful portion of the funds potentially available for distributions to general unsecured creditors. Moreover, even the most strenuous efforts would not necessarily result in a successful and useful disentanglement of the Debtors' businesses.

28. I note that no creditor has objected to the Plan on the basis of the proposed distribution methodology. I further note that the Committee (which consists of creditors of MFS and FLI) voted in favor of the proposed distribution methodology with no objections.

29. Preliminarily, I also note that the state of the Debtors' books, records and systems would contribute to the difficulty in accurately and efficiently allocating remaining assets and liabilities between the Debtors' estates. From the work done in these cases by my colleagues and me, I understand that the computer systems are antiquated and the software and information databases do not contain extensive detail explaining all entries. We have examined extensive book keeping entries between the Debtors, or among one or both of the Debtors and their various affiliates, under the general ledger headings "accounts receivables/accounts payable," "due to/due from" and "loan to/loan from." Most of these general ledger entries do not reference detail for the entry. In the context of developing litigation claims on behalf of both estates, my colleagues and I have undertaken investigations into the detail of many of these entries, but the shear magnitude of these entries and the archaic quality of the systems necessitate extensive manpower to validate or understand historical accounts.

30. Moreover, as has been evidenced by parties alleging that they are creditors of one of the Debtors despite not being listed on the Debtors' books and records, I believe that, at a minimum, significant effort and expense would be required to validate whether the information on the Debtors' books and records regarding creditors is credible.

31. Part of the difficulty in disentangling the Debtors' records derives from the complex history of the Debtors' manufactured jewelry business, which ultimately morphed into FLI.

32. I am informed that MFS's predecessor was established in 1895 as a manufacturer and distributor of diamonds and that it entered the business of manufacturing and wholesaling jewelry (which is different than selling cut and polished diamonds) sometime in the 1970s.

33. I am also informed that trusts formed for the benefit of the children of the

controlling stockholder of MFS bought a controlling interest in Leer Gem Ltd., sometime in the mid 1970s. I am informed that Leer Gem was then a seller of colored gemstones and later grew into a jewelry manufacturer, ultimately selling product similar to that of MFS's jewelry business.

34. I am informed that, in or around May 2005, the trusts mentioned in the preceding paragraph exchanged their interests in Leer Gem for shares in MFS, whereby MFS became the direct majority owner of Leer Gem pursuant to a tax free reorganization.

35. I am informed that MFS's jewelry business and Leer Gem ran separately until June 2005, when Leer Gem acquired the manufactured jewelry (not the cut and polished and solitaire diamond) inventory from MFS on a consigned basis, and renamed itself FLI.

36. I am informed that the Original Lenders insisted that FLI become jointly and severally liable on MFS's bank debt in connection with this transfer of inventory, and that FLI agreed to become so obliged in or around January 2006.

37. I believe that it would be difficult at this point given the quality of the Debtors' systems and records and the loss of several of their key people to determine the true valuation of the jewelry inventory acquired by FLI, the historical losses in the MFS jewelry business embodied in MFS's borrowings prior to its sale to FLI and the performance of FLI in selling and accounting for the former MFS jewelry inventory after May 2005. Without this information, it would be impossible to understand the intra-Debtor balances and properly allocate liabilities between the Debtors.

38. Moreover, I believe that MFS's role as the chief borrower and re-lender to FLI and the Debtors' other affiliates makes it difficult to make appropriate allocations of MFS's borrowed debt.

39. Even assuming one could accurately allocate liabilities between the Debtors

(third-party and intra- Debtor liabilities), I believe it would be impractical to allocate accurately the remaining distributable assets among the Debtors as the largest possible recoveries available to unsecured creditors relate to complex and unresolved litigation. The Committee has already brought a legal action against the eight Original Lenders in this Court, and it is expected that the Shared Assets Trust will bring actions against several insiders and affiliates to recover avoidable transfers. In the former case, as discussed above, the recoveries will inure to the exclusive benefit of the unsecured creditors; in the latter, the recoveries will be shared between unsecured creditors and the Current Lenders in accordance with an agreed-upon waterfall mechanism. The facts behind these cases are complex and, while legal counsel has given me reason to be confident in a recovery, it is unclear to me that any judgment or settlement would allocate payments along separate Debtor lines. Determining how to allocate any future recoveries between separate estates would require not only some measurement of how much damage was done to each estate by each defendant, but also a calculation of the debts each Debtor owes to one another, and what right and priority each Co-Debtor would have against the other, relative to unrelated third-party creditors.

40. I believe that allocating extensive professional resources to disentangling the businesses of the Debtors at this time would be a poor exercise of judgment. At the time of the Plan Settlement, absent the successful settlement or prosecution of claims against the Original Lenders or the Current Lenders, the prospect of unsecured creditors receiving a distribution was remote. Even now, in order for unsecured creditors to recover more than $5.0 million, the GUC Trust and/or the Shared Assets Trust will need to win what will likely be highly contested litigation. In this context, I do not believe it is fair or reasonable to expend what could be millions of dollars in professional fees to disentangle the Debtors' assets and liabilities.

Moreover, I cannot guaranty that the expenditure of such funds will result in a clear allocation between the Debtors.

41.  Moreover, I believe that unsecured creditors may have understood that the two Debtors were, or were part of, one legal entity.

42.  I understand that for over 100 years, the various organizations within the jewelry empire controlled by the Fabrikant and Fortgang families were known generically as "Fabrikant."

43.  The Debtors and their predecessors participated in extensive industry trade, social and charitable events as a single unified entity.

44.  When creditors visited the Debtors, they came to common offices regardless of the legal entity to which they were selling, and there was no demarcation between MFS space and FLI space within these offices.  Creditors generally dealt with the same top executive team and administrative personnel regardless of to whom they were selling.  (Though product personnel were unique to the specific product being purchased or sold, it is unclear whether they identified themselves as being employees of MFS or FLI, or simply employees of "Fabrikant.")  At key trade shows, there was a single large Fabrikant booth with different substations inside, implying distinction by product but not necessarily legal separation.

45.  Even when the Fabrikant entities had themselves extended credit to bankrupt retailers, a single representative typically represented "Fabrikant" on the committee of unsecured creditors, often chairing or otherwise taking a leadership role outwardly as a single enterprise.

46.  Throughout these bankruptcy cases, there have also been indicia of creditor expectations regarding distribution treatment.  The cases have been administratively consolidated from the first day, and a single five-member Official Committee of Unsecured Creditors was

empanelled with no open debate about whether two separate committees should be formed. The trade press has, with no exceptions of which I am aware, covered the proceedings of the bankruptcy as the bankruptcy of "Fabrikant," not as two separate debtors. Importantly, as discussed above, the Committee has acted with one voice in the pursuit of recoveries against parties it believes harmed the estates, and there has been, to my knowledge, no desire expressed by any of the Committee members for separate treatment of the two estates.

47. Given that the unsecured creditors may receive in the aggregate relatively modest recoveries in these cases, I believe it would be unfair and wasteful to expend significant estate dollars to conduct further forensic investigations into the separation of these two Debtors, especially since there are no guarantees that such investigations would bear fruit.

## Conclusion

48. Based on the foregoing, I believe that (a) the Plan Settlement is fair and equitable, reasonable, in the best interests of the Debtors' estates and should be approved; (b) the Plan satisfies the "best interests test" set forth in section 1129(a)(7) of the Code; and (c) substantive consolidation of the Estates as set forth in the Plan is warranted and appropriate. Accordingly, I believe that this Court should confirm Plan.

I declare under penalty of perjury that the foregoing is true and correct of my own personal knowledge.

Dated: December 17, 2007

                                                                               /s/ Michael A. O'Hara
                                                                                 Michael A. O'Hara