UNITED STATES BANKRUPTCY COURT   **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re:       :   Chapter 11
          :
M. FABRIKANT & SONS, INC., et al., :   Case No. 06-12737 (SMB)
          :   (Jointly Administered)
      Debtors. :
-------------------------------------------------------X

## MEMORANDUM DECISION AND ORDER OVERRULING
## OBJECTIONS TO CONFIRMATION OF THE PLAN

**A P P E A R A N C E S :**

TROUTMAN SANDERS LLP
Attorneys for the Debtors
The Chrysler Building
405 Lexington Avenue
New York, New York 10174

  Mitchel H. Perkiel, Esq.
  Lee W. Stremba, Esq.
  Paul H. Deutch, Esq.
   Of Counsel

KRAMER, LEVIN, NAFTALIS & FRANKEL LLP
Attorneys for Wilmington Trust Company
1177 Avenue of the Americas
New York, New York 10036

  Philip Bentley, Esq.
  David M. Feldman, Esq.
  Matthew K. Kelsey, Esq.
   Of Counsel

MOSES & SINGER LLP
Attorneys for the Official Committee of Unsecured Creditors
The Chrysler Building
405 Lexington Avenue
New York, New York 10174

  Alan Kolod, Esq.
  Lawrence L. Ginsburg, Esq.
  Christopher Gresh, Esq.
  Christopher J. Caruso, Esq.
   Of Counsel

HALPERIN, BATTAGLIA, RAICHT LLP
Conflicts Counsel to the Official Committee of Unsecured Creditors
555 Madison Avenue, 9th Floor
New York, New York 10022

  Christopher J. Battaglia, Esq.
  Ethan D. Ganc, Esq.
   Of Counsel

HAHN & HESSEN LLP
Attorneys for JPMorgan Chase Bank N.A.
488 Madison Avenue
New York, New York 10022

  Steven J. Mandelsberg, Esq.
  Joshua I. Divack, Esq.
   Of Counsel

CADWALADER, WICKERSHAM & TAFT LLP
Attorneys for ABN Amro Bank N.V.
One World Financial Center
New York, New York 10281

  Evan R. Fleck, Esq.
  Gregory M. Petrick, Esq.
   Of Counsel

REIMER & BRAUNSTEIN LLP
Attorneys for Bank of America, N.A.
Three Center Plaza
Boston, Massachusetts 02108

  Paul S. Samson, Esq.
  Jeffrey D. Ganz, Esq.
   Of Counsel

PHILLIPS LYTLE LLP
Attorneys for HSBC Bank USA
437 Madison Avenue, 34th Floor
New York, New York 10022

  William J. Brown, Esq.
  Allan L. Hill, Esq.
   Of Counsel

HERRICK, FEINSTEIN LLP
Attorneys for Bank Leumi
2 Park Avenue
New York, New York 10016

>       Andrew C. Gold, Esq.
>       Frederick E. Schmidt, Esq.
>           Of Counsel

HELLER EHRMAN LLP
Attorneys for Israel Discount Bank of New York
Times Square Tower
7 Times Square
New York, New York 10036

>       Timothy Mehok, Esq.
>           Of Counsel

MILBANK, TWEED, HADLEY & McCLOY LLP
Attorneys for Sovereign Precious Metals LLC and Sovereign Bank
1 Chase Manhattan Plaza
New York, New York 10005

>       Douglaw W. Henkin, Esq.
>       Wilbur F. Foster, Jr., Esq.
>           Of Counsel

OFFICE OF THE U.S. TRUSTEE
Attorneys for the U.S. Trustee
33 Whitehall Street, 21st Floor
New York, New York 10004

>       Alicia Leonhard, Esq.
>           Of Counsel

**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge**

The debtors, the Official Committee of Unsecured Creditors (the "Committee")

and Wilmington Trust Company, as collateral and administrative agent for a group of

secured lenders (the "Current Lenders," and together with the debtors and the Committee,

the "Plan Proponents"), jointly proposed a plan of reorganization (the "Plan").  The

assignors of the Current Lenders' claims (i.e., the "Original Lenders") objected to the

Plan,[1] as did Sovereign Bank, both an Original Lender as well as the putative holder of a

separate claim (the VSI Guaranty, described below).  The substance of the objections

centered on certain reimbursement rights (the "Reimbursement Rights") granted to the

Original Lenders under the final cash collateral order entered in this case.

The Original Lenders subsequently assigned their rights to the Current Lenders.

The principal dispute is whether the assignments also transferred the Reimbursement

Rights.  In addition, Sovereign Bank contends that it still holds the Reimbursement

Rights in connection with the VSI Guaranty, which was never assigned.  For the reasons

that follow, the objections are overruled.

## FACTS

**A.      The Original Lenders**

M. Fabrikant & Sons, Inc ("MFS"), established in 1895, was one of the world's

largest manufacturers and distributors of diamonds.  MFS is a privately held New York

corporation, and owns 81% of Fabrikant-Leer International, Ltd. ("FLI"), also a New

York corporation.  MFS and FLI are the debtors in these chapter 11 cases.  In the course

of their business, the debtors entered into separate loans or financial arrangements with

the Original Lenders, a group that included ABN, ADB, Bank of America, N.A.

("BOA"), Bank Leumi USA ("BL"), HSBC Bank USA, National Association ("HSBC"),

Israel Discount Bank of New York ("IDB"), JPMorgan Chase Bank, N.A. ("JPMorgan"),

---

[1]      Two Original Lenders, ABN Amro Bank N.V. ("ABN") and Antwerpse Diamantbank, N.V.
("ADB"), did not object to confirmation, but nevertheless asserted the same claims that underlay the
Original Lenders' objections.

Sovereign and Sovereign Precious Metals LLC ("SPM").  In each case, the debtors

granted the Original Lender a security interest in their assets to collateralize the loan.

In an entirely separate transaction in February 2004, MFS guarantied the

obligations of its subsidiary, Vision, Solutions, Impact, LLC, to Sovereign (the "VSI

Guaranty").  The VSI Guaranty was unsecured.[2]

## B.    The Amended and Extended Security Agreements[3]

On January 13, 2006, MFS and the Original Lenders (except for Sovereign)

entered into the Second Amended and Restated Security Agreement ("January 2006

Agreement").[4]  The January 2006 Agreement was intended "[t]o secure the prompt,

complete and unconditional payment and performance to Agent [JP Morgan, as collateral

agent] and each of the Creditors of the Borrower's Obligation."  (January 2006

Agreement, at ¶ 3(a).)  "Borrower's Obligations" meant

> each and every obligation, liability and indebtedness of any kind or
> character whatsoever, whether now existing or hereafter incurred, direct or
> indirect, absolute or contingent, matured or unmatured of Borrower
> hereunder to Agent or to any Creditor pursuant to any Loan Agreement or
> the Borrower Guaranties, or otherwise.

(Id., at ¶ 2(a).)  The "Borrower Guaranties" meant "the Guaranties dated as of January

13, 2006, on behalf of each of BL and ABN by which Borrower has guaranteed FL's

---

[2]      The VSI Guaranty provided by Sovereign was undated and unsigned.  No party contested its
validity.  I assume, therefore, that MFS actually signed the VSI Guaranty and delivered it to Sovereign.

[3]      These documents were discussed by the Original Lenders and the Plan Proponents in their
submissions.  Copies of the documents are attached as Exhibits B through H to the Declaration of Robert R.
Miller in Support of Sovereign Precious Metal LLC's Motion to Dismiss the Complaint, dated Dec. 10,
2007 (Adv. Pro. # 07-2780)(ECF Doc. # 34).

[4]      The same creditors entered into a similar agreement with FLI.  (See Security Agreement, dated
Jan. 13, 2006.)

obligations to BL and ABN." (Id.)  As noted, Sovereign was not a party to, beneficiary

of, or "Creditor" under, the January 2006 Agreement, and remained unsecured.

Sovereign's status changed in July 2006.  MFS and BankBoston, N.A. had

entered into a consignment agreement in 1988 (the "Consignment Agreement").

(Amended and Restated Consignment Agreement, dated Dec. 31, 1998, at 1.)  The

Consignment Agreement was amended several times over the next 20 years, and its

purpose was to enable MFS to buy precious gems from SPM or one of its predecessors.

(Objection Of Sovereign Precious Metals, LLC And Sovereign Bank To Confirmation Of

Proposed Joint Plan Of Liquidation, dated Dec. 7, 2007, at ¶ 1)("Sovereign Objection")

(ECF Doc. # 528); see Amended and Restated Consignment Agreement, at 1.)

Sovereign eventually succeeded to the interests of BankBoston, and assigned its rights to

SPM.  (Eighth Amendment to Amended and Restated Consignment Agreement Dated as

of December 31, 1998, dated July 7, 2006 ("Eighth Amendment"), at 1).  Pursuant to a

secured demand note dated July 7, 2006 (the "Sovereign Note"), Sovereign loaned MFS

$33 million to repurchase 50,760 fine troy ounces of gold from SPM.  (Eighth

Amendment, at § 2.)  MFS reaffirmed the security interest that it had granted to SPM

under the January 2006 Agreement; SPM assigned those rights to Sovereign; and the

parties acknowledged that Sovereign was substituted for SPM as a secured lender under

the January 2006 Agreement.  (Id., at § 4.)

On the same day, MFS, the Creditors under the January 2006 Agreement and

Sovereign entered into the Joinder to Security Agreements, dated as of July 7, 2006

("Sovereign Joinder").  The Sovereign Joinder brought Sovereign into the family of

Original Lenders.  It did not mention the Consignment Agreement, the Sovereign Note,

the VSI Guaranty, or any specific MFS debt.  Instead, the parties acknowledged in the

"Background" section that

> [p]ursuant to certain agreements or documents with or between the
> Borrower [MFS] and Sovereign, Sovereign has agreed to provide financial
> accommodations to the Borrower.  As security for such financial
> accommodations, each Credit Party desires to grant a security interest in
> its respective Collateral to the Agent for the benefit of Sovereign.  Upon
> the terms and conditions set forth herein, each of the Credit Parties and the
> Creditors agree to having Sovereign become a Creditor under each
> Security Agreement.

(Sovereign Joinder, at 2.)

Accordingly, the parties stipulated that

> Sovereign shall be and become, for all purposes a Creditor under the
> Borrower Security Agreement and the FL Security Agreement, and all
> references to "Creditor" and "Creditors" under each Security Agreement
> shall be deemed to include as of such date Sovereign.  Notwithstanding
> the foregoing, the parties hereto acknowledge that Sovereign did not have
> a security interest in the Collateral prior to the Effective Date.

(Id., at ¶ 2(a).)


## C.    The FCCO

The debtors filed their chapter 11 petitions on November 17, 2006.  On December

18, 2006, the Court entered the Final Order Authorizing Debtors' Use of Cash Collateral

and Granting Adequate Protection Claim and Lien ("FCCO")(ECF Doc. # 93).

According to the FCCO, the debtors owed the Original Lenders $161,945,000 (the "Pre-

Petition Obligations"), the Pre-Petition Obligations were secured by the "Pre-Petition

Collateral," and the Original Lenders agreed to allow the debtors to use the "Pre-Petition

Collateral" and any cash collateral in accordance with the terms of the FCCO.  (FCCO, at

6.)  All of the covenants, terms and conditions constituted adequate protection for the use

of "Pre-Petition Collateral," even if they were not specifically denominated as "adequate

protection." (Id., at ¶ 2.)

The FCCO granted the Original Lenders specific adequate protection in the form

of an "Adequate Protection Claim" to cover the diminution in the value of their "Pre-

Petition Collateral." (Id., at ¶ 3.) It also granted an "Adequate Protection Lien" to secure

the "Adequate Protection Claim". (Id., at ¶ 4.) Finally, although not denominated

adequate protection, the FCCO granted the Reimbursement Rights at issue in this dispute.

Paragraph 10 stated in relevant part:

> In addition to the fees, costs, charges and expenses authorized under the
> Pre-Petition Agreements, the Debtors shall pay in accordance with the procedures
> set forth in the following sentences, as allowed post-petition administrative
> expenses entitled to the priority and security afforded to the Adequate Protection
> Claim, all of Collateral Agent's and each Lender's reasonable (in all respects)
> attorneys' and other professionals' fees and reimbursable expenses arising from or
> related to (a) this Order, including without limitation the negotiating, closing,
> documenting and obtaining of Court approval thereof, (b) all proceedings in
> connection with any Disposition (as such term is defined below), (c) all
> proceedings in connection with the interpretation, amendment, modification,
> enforcement, enforceability, validity or implementation of the Pre-Petition
> Agreements or this Order at any time, (d) all other matters and proceedings
> arising in or related to the Debtors' bankruptcy cases, and (e) all reasonable
> expenses, costs and charges in any way or respect arising in connection with the
> foregoing (collectively, the "Lender Expenses").

**D.    The Assignments**[5]

The FCCO and continuing through February

2007, each of the Original Lenders transferred their secured claims and security interests

---

[5]    The Court directed the Original Lenders to provide copies of documentation relating to the
assignments.  All but ADB complied, and the documents were received into evidence at the December 21,
2007 hearing as Wilmington Exhibits ("WX") 1 through 7.  (Transcript of hearing, held Dec. 21, 2007, at
9)("12/21 Tr.")(ECF Doc. # 602.)  ADB submitted its documentation after the hearing, and it was never
formally received in evidence.  The omission was harmless, and does not affect the disposition of the
dispute.  Its transfer documentation was substantially similar to the documentation submitted by the other
Original Lenders.

to the Current Lenders.[6]  Each Original Lender entered into a transfer agreement with its respective transferee (collectively, the "Transfer Agreements").  Each Transfer Agreement identified a specific obligation, usually by reference to a particular credit agreement, note or loan.  None listed the FCCO as a "Credit Document."  The Transfer Agreements incorporated the Purchase and Sale Agreement for Distressed Trades, LSTA Standard Terms and Conditions (the "Standard Terms and Conditions") in form or in substance.  While the language in the several Transfer Agreements varied, all parties agree that the relevant portions of the Standard Terms and Conditions, and in particular, the scope of the assigned rights, are substantially similar under each assignment. (Compare Joint Memorandum In Opposition To Confirmation submitted by the Original Lenders, dated Jan. 4, 2008 (the "Original Lenders' Memo"), at 3 n.7 (ECF Doc. # 570)("Although the Original Lenders' agreements incorporated different versions of the Standard Terms and Conditions, the relevant portions of the Standard Terms and Conditions are substantially similar.") with Memorandum of Law of Plan Proponents, (A) In Support of Plan Proponents' Oral Motion Seeking to Estimate the Asserted Administrative Claims of the Original Lenders at Zero; (B) Responding to Joint Memorandum in Opposition to Confirmation; and (C) Responding to the Letter of Sovereign Entities Asserting a Claim, dated Jan. 14, 2008, at 5-6 n.5 (ECF Doc. # 578)("The BOA Transfer Document varies slightly from the other Transfer Documents [substituting "Loans" for "Transferred Rights," but is] substantially similar to the definition of 'Transferred Rights' set forth above.").)

---

[6]    I assume for the purpose of this opinion that the assignments to the Current Lenders took effect after the date of the FCCO.  If an Original Lender transferred its claims and liens before then, and had no interest in the "Pre-Petition Collateral" at the time of the FCCO, it was not entitled to the benefits of the FCCO.

The Standard Terms and Conditions provided that the "Seller irrevocably sells, transfers, assigns, grants and conveys the Transferred Rights to Buyer."  (<u>Standard Terms and Conditions</u>, § 2(a), at 7 (effective Dec. 1, 2006).)  The "Transferred Rights" included, <u>inter alia</u>,

> any and all of Seller's right, title, and interest in, to and under the Loans and Commitments (if any) and, to the extent related thereto, the following (<u>excluding</u>, <u>however</u>, the Retained Interest, if any)
>
> . . . .
>
> (e)      all claims (including "claims" as defined in Bankruptcy Code Section 101(5)), suits, causes of action, and any other right of Seller . . . that is <u>based upon, arises out of or is related to any of the foregoing</u>, including, to the extent permitted to be assigned under applicable law, all claims (including contract claims, tort claims, malpractice claims, . . .) suits, causes of action, and any other right of Seller . . . against any attorney, accountant, financial advisor, or other Entity <u>arising under or in connection with the Credit Documents or the transactions related thereto or contemplated thereby</u> . . . .

(<u>Id.</u>, § 1.2, at 6-7)(emphasis added).

The Standard Terms and Conditions carved out only one group of rights  -- the "Retained Interest" -- from the broad definition of "Transferred Rights":

> "Retained Interests" means, if "Settled Without Accrued Interest" is specified in the Transaction Specific Terms, the right retained by Seller to receive, in accordance with the provisions of Section 8.3, payments or other distributions, whether received by setoff or otherwise, of cash (including interest), notes, securities or other property (including Collateral) or proceeds paid or delivered in respect of the Pre-Settlement Date Accruals or the Adequate Protection Payments (if any); <u>provided</u> that Retained Interest shall not include any PIK Interest.

 (<u>Id.</u>, § 1.2, at 5.)   "Adequate Protection Payments" meant, with respect to the "Transferred Rights," amounts (other than "PIK Interest") ordered to be paid by the

Bankruptcy Court as adequate protection under an "Adequate Protection Order"[7] for the loans and obligations owed under the "Credit Agreement" "that accrue during the period before (but excluding) the earlier of (a) the Settlement Date and (b) T+20."[8]  (Id., § 1.2, at 1.)  Finally, the seller of the claim agreed to indemnify the buyer, and also pay the buyer's attorneys' fees and expenses, if the buyer was forced to disgorge or reimburse any payments or property received by the seller in connection with the "Transferred Rights," or any other claim that the seller might have against the borrower or obligor. (See id., § 6.1(a) & (b), at 17-18.)

Sovereign assigned the Sovereign Note, but did not assign the VSI Guaranty. (See WX 5.)

## E.    The Adversary Proceeding

Subsequent to the assignments and the entry of the FCCO, on October 1, 2007, the Committee commenced an adversary proceeding in this Court against the Original Lenders, entitled Official Comm. of Unsecured Creditors of M. Fabrikant & Sons, Inc. and Fabrikant-Leer Int'l, Ltd. v. JP Morgan Chase Bank, N.A., et al., Adv. Pro. No. 07-2780)(the "Adversary Proceeding").[9]  The Committee seeks, among other things, to avoid the obligations and security interests that the Original Lenders transferred to the

---

[7]        "Adequate Protection Order" meant "any order of the Bankruptcy Court authorizing or ordering Borrower or any Obligor to make adequate protection payments to the Lenders, including any adequate protection order specifically identified in the Annex."  (Standard Terms and Conditions, § 1.2, at 1.)

[8]        "T + 20" meant "the date that is twenty (20) Business Days after the Trade Date."  (Id., § 1.2, at 6.)

[9]        The Committee did not name Sovereign.  The Committee contends that this was a mistake, and has filed an amended complaint that adds Sovereign as a defendant.  This opinion assumes for the purpose of discussion that all of the Original Lenders are defendants.  This assumption does not affect the disposition.

Current Lenders, and recover the value of the transferred security interests for the benefit

of the estates.  The Committee maintains that it could have asserted the same claims

against the Current Lenders, but did not because the Committee and the debtors reached a

settlement with the Current Lenders that is incorporated into the Plan.  (See Third

Amended Disclosure Statement for Joint Plan of Liquidation Under Chapter 11 of the

Bankruptcy Code of the Plan Proponents, dated Nov. 7, 2007, at 22-24 ("Disclosure

Statement")(ECF Doc. # 458.)

The Original Lenders have vigorously defended the Adversary Proceeding.[10]  In

the process, they have incurred and will continue to incur substantial legal fees and

expenses that, they contend, are covered by the Reimbursement Rights they claim to

hold.  They also filed administrative claims to recover their actual attorneys' fees and

expenses to date, plus estimated future fees and expenses.

**F.      The Plan**

The Court approved the Disclosure Statement by order dated November 7, 2007,

(ECF Doc. # 459), and conducted the confirmation hearing on December 19 and 21,

2007.  The Original Lenders objected to confirmation of the Plan[11] on several grounds

centering on the administrative claim status of their alleged Reimbursement Rights.  They

contended that (i) the Plan violated the priority of distribution under section

1129(a)(9)(A) by failing to provide for the payment in full of their Reimbursement

Rights; (ii) the Plan failed to separately classify their Reimbursement Rights and specify

---

[10]      The Original Lenders have moved to dismiss the complaint.  That motion will be the subject of a
separate opinion.

[11]      See supra note 1.

their treatment; (iii) their Reimbursement Rights were impaired under the Plan; and (iv)

the treatment of their Reimbursement Rights was not fair and equitable under section

1129(b)(1) and (b)(2) of the Code because the Plan did not contemplate the establishment

of a reserve to pay them.  (See, e.g., Sovereign Objection, at 4-7.)

The Court conducted an evidentiary hearing on the other confirmation issues on

December 19, 2007, and scheduled a trial to hear the Original Lenders' objections for

December 21, 2007.  (Transcript of hearing, held Dec. 19, 2007, at 47)("12/19 Tr.")(ECF

Doc. # 601.)  The Court also scheduled the continuation of the hearing pertaining to a

separate objection that the Plan did not satisfy the "best interests" test.  See 11 U.S.C. §

1129(a)(7).[12]

Neither the Original Lenders nor the Plan Proponents called witnesses at the

continued hearing.  Instead, they submitted copies of the Transfer Agreements and

pertinent documents and orders, including the FCCO.

## DISCUSSION

The disputes in this matter center on the interpretation of the parties' various

contracts.  When faced with such questions, the primary objective is to give effect to the

parties' intent.  Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d

1091, 1094 (2d Cir. 1993); Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425,

428 (2d Cir. 1992).  Where the parties' intent is not plain from the language they used, a

court may look to the objective manifestations of intent gathered from the parties' words

and deeds.  Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp., 361 N.E.2d 999,

---

[12]        The Court overruled this objection from the bench following the close of the evidence.

1001 (N.Y. 1977); <u>Nycal Corp. v. Inoco PLC</u>, 988 F. Supp. 296, 301 (S.D.N.Y. 1997).

"The secret or subjective intent of the parties is irrelevant." <u>Klos v. Polskie Linie</u>

<u>Lotnicze</u>, 133 F.3d 164, 168 (2d Cir. 1997).

**A.     The Assignments**

    **1.     The Transfer Agreements**

Each of the Original Lenders assigned, <u>inter alia</u>, "all claims (including 'claims'

as defined in Bankruptcy Code Section 101(5)), suits, causes of action, and any other

right of Seller or any Prior Seller, whether known or unknown . . . arising under or in

connection with the Credit Documents or the transactions related thereto or contemplated

thereby." Under § 101(5)(A), "claim" means a

> right to payment, whether or not such right is reduced to judgment,
> liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed,
> undisputed, legal, equitable, secured, or unsecured.

This broad definition was intended to reach all legal obligations, no matter how remote,

and deal with them in the bankruptcy case. H.R. REP. NO. 95-595, at 309 (1977); S. REP.

NO. 95-989, at 21 (1978); <u>see</u> <u>Ohio v. Kovacs</u>, 469 U.S. 274, 279 (1985)("it is apparent

that Congress desired a broad definition of a 'claim'"); <u>United States v. LTV Corp. (In re</u>

<u>Chateaugay Corp.</u>), 944 F.2d 997, 1003 (2d Cir. 1991)("Congress unquestionably

expected this definition [of a claim] to have wide scope.").

The Reimbursement Rights satisfy this broad definition. At the time of the

assignments, they represented contingent rights to indemnity that arose under the FCCO.

"Under contract law, a right to payment based on a written indemnification contract

arises at the time the indemnification agreement is executed." <u>Olin Corp. v. Riverwood</u>

<u>Int'l Corp. (In re Manville Forest Prods. Corp.</u>), 209 F.3d 125, 129 (2d Cir. 2000). The

FCCO is not a contract, but nonetheless bears the hallmarks of one.   Such orders are heavily negotiated among all of the parties in interest, and are akin to court-approved stipulations.  In any event, the right to reimbursement under the FCCO arose prior to the assignments.

The Reimbursement Rights are also "related" to, and arose "in connection with the Credit Documents or the transactions related thereto or contemplated thereby."  The Reimbursement Rights, along with the other adequate protection, were granted under the FCCO in exchange for the debtors' use of the Original Lenders' cash and other "Pre-Petition Collateral."  The Original Lenders' interests in the "Pre-Petition Collateral" arose by virtue of and in connection with the "Credit Documents."   Furthermore, the Original Lenders do not dispute that the other adequate protection rights provided in the FCCO – the "Adequate Protection Claim," the "Adequate Protection Lien," as well as the rights to monitor the loans and the collateral, call a default and, where necessary and appropriate, seize the collateral – were transferred to the Current Lenders.  Accordingly, the Reimbursement Rights plainly fall within the scope of the "Transferred Rights."

The Original Lenders have offered several reasons why the broad language of the Transfer Agreements should nonetheless be read to exclude the Reimbursement Rights.  First, they contend that "claims" under the Bankruptcy Code are limited to pre-petition rights to payment, and the Reimbursement Rights arose post-petition.  The definition of "claim" does not, however, distinguish between pre- and post-petition rights.  Accordingly, the Bankruptcy Code uses qualifying language when the intent is to limit a provision to pre-petition claims.  For example, a "creditor" is one that "has a claim against the debtor that arose at the time of or before the order for relief concerning the

debtor."  11 U.S.C. § 101(10)(A).[13]  Similarly, the automatic stay prohibits the

commencement or continuation of an action "to recover a claim against the debtor that

arose before the commencement of the case under this title."  11 U.S.C. § 362(a)(1).

Finally, the section 727(b) discharge only extends to debts (i.e., the "liability on a claim,"

11 U.S.C. § 101(12)) "that arose before the date of the order for relief."  The Original

Lenders' interpretation of "claim" renders most if not all of the limiting language in these

provisions superfluous, and violates the maxim that statutes should not be interpreted in

a manner that renders any word or provision superfluous.  See Hibbs v. Winn, 542 U.S.

88, 89 (2004); Doe v. Chao, 540 U.S. 614, 630-31 (2004); see generally 2A NORMAN J.

SINGER & J. D. SHAMBIE SINGER, SUTHERLAND STATUTORY CONSTRUCTION, § 46:6 at

230-52 (7th ed. 2007).

In addition, other provisions in the Bankruptcy Code expressly refer to post-

petition "claims."  For example, section 348(d) deals with "[a] claim against the estate or

the debtor that arises after the order for relief" but before an order of conversion.  Section

502(f) addresses "claims" that arise after the commencement of the case but before the

appointment of a trustee or the entry of an order for relief in an involuntary case (i.e.,

"gap claims").  Section 1129(a)(9)(A) states, in substance, that the chapter 11 must

provide for the payment of post-petition administrative and involuntary gap "claims" on

the effective date of the plan.  Section 1171(a) grants a priority to certain claims,

"whether such claim arose before or after the commencement of the case."  Finally, the

chapter 11 confirmation order discharges "any debt that arose before the date of such

---

[13]    The commencement of a voluntary case constitutes an "order for relief."  11 U.S.C. § 301(b).
Except in the case of involuntary petitions, date of the order for relief and the petition date are the same.  In
addition, an order converting a case to another chapter constitutes an order for relief.  11 U.S.C. § 348(a).

confirmation."  11 U.S.C. § 1141(d)(1)(A).  By definition, the confirmation occurs after

the commencement of the case.  These are but a few examples of instances in which the

Bankruptcy Code expressly recognizes post-petition "claims."

It is true, as the Original Lenders point out, that some decisions equate "claims"

with pre-petition rights to payment.  E.g., LTV Steel Co., Inc. v. Shalala (In re

Chateaugay Corp.), 53 F.3d 478, 497 (2d Cir. 1995)("However broadly 'claim' is

understood, it is clear that the existence of a valid bankruptcy claim depends on  . . .

whether that right arose before the filing of the petition.");  Federated Dep't Stores, Inc. v.

Wongco (In re R.H. Macy & Co., Inc.), 236 B.R. 583, 589 (Bankr. S.D.N.Y.

1999)(same), aff'd, 283 B.R. 140 (S.D.N.Y. 2002), aff'd, 67 Fed. Appx. 30 (2d Cir.

2003).  These and similar cases are concerned with when the right to payment arose, and

typically implicate the discharge provisions of the Bankruptcy Code or the deadline for

filing a pre-petition claim under a bar date order.  They do not support the rule that

notwithstanding the language of the Bankruptcy Code, the definition of "claim" is limited

to a pre-petition right to payment.[14]  Rather, the plain language of the Bankruptcy Code

---

[14]        The Second Circuit commented on the inconsistency between the language of the Bankruptcy
Code and its decision in Chateaugay in Manville Forest Products Corp.  There, Riverwood's predecessor
entered into two pre-petition agreements to indemnify Olin.  Riverwood subsequently filed a chapter 11
petition, but Olin failed to file a proof of claim prior to the deadline applicable to pre-petition claims.
Following confirmation, Olin incurred environmental clean-up costs, and demanded indemnification from
Riverwood.  The issue was whether the right of indemnification arose pre-petition, and was barred by the
confirmation discharge.  The Court observed:

> We see an inconsistency between the wording of the Bankruptcy Code, which discharges
> debt arising before the confirmation date, and our statement in LTV Steel Co. (In re
> Chateaugay Corp.) that the discharged debt must arise before the filing date.  However,
> we need not resolve that point here, because (as discussed below) Olin's claims did in fact
> arise pre-petition.  Chronologically, Olin's claims necessarily arose pre-confirmation as
> well.

209 F.3d at 128 n.1; accord West v. WorldCom, Inc. (In re WorldCom, Inc.), No. 06 Civ. 0748(WHP),
2007 WL 3407060, at *2 n. 1  (S.D.N.Y. Nov. 14, 2007.)

demonstrates that a "claim" includes a post-petition as well as pre-petition right to payment.

Finally, the "Transferred Rights" included all claims, not just "claims" as defined in the Bankruptcy Code.  Thus, the reference to the Bankruptcy Code definition did not limit the transfer to bankruptcy "claims."  The only right excepted from the definition of "Transferred Rights" was the "Retained Interest."  At most, the "Retained Interest" included adequate protection payments that accrued during the earlier of the Settlement Date and 20 days after the "Trade Date."  Both dates passed long before the Committee commenced the Adversary Proceeding, and the Original Lenders started to incur litigation expenses.

The Original Lenders also point out that certain language in the Transfer Agreements implied that the Original Lenders did not intend to transfer the Reimbursement Rights.  For example, the FCCO is not a "Credit Document" under the Standard Terms and Conditions.  In addition, the Standard Terms and Conditions distinguished between "Transferred Rights" and "Credit Agreements" on the one hand, and "Adequate Protection Orders" and "Adequate Protection Payments" on the other. (Original Lenders' Memo, at 3-5.)

These examples do not affect my conclusion.  The Transfer Agreements contained an all-encompassing assignment of rights.  The transfers were not limited to the specific loan documents, and included claims, causes of action, etc. "arising under or in connection with the Credit Documents or the transactions related thereto or contemplated thereby."  Thus, it is not surprising that the Transfer Agreements mentioned rights arising

under different agreements, and where appropriate, dealt with them.  For example, the

transfer of "Adequate Protection Payments" did not include payments that accrued before

the earlier of the "Settlement Date" and "T + 20."  This treatment implied that all other

"Adequate Protection Payments", including the Reimbursement Rights that had not yet

accrued, were transferred.

Next, the Original Lenders emphasize that they could not have intended to

transfer the Reimbursement Rights to the Current Lenders while leaving themselves open

to a lawsuit by the Committee.  (Original Lenders' Memo, at 2 n.5)("It is simply illogical

for the Plan Proponents to suggest that the same document that saddles the Original

Lenders with defending claims for pre-transfer events assigns away their Reimbursement

Rights associated with a successful defense to such claims.")  In fact, the Original

Lenders posit that the Reimbursement Rights are personal and have value only to them

and no value to the Current Lenders.  (Id., at 7-8.)

This argument ignores the extent of the Reimbursement Rights granted under

paragraph 10 of the FCCO.  They are not limited to litigation expenses.  Instead, they

expressly cover "all proceedings in connection with the interpretation, amendment,

modification, enforcement, enforceability, validity or implementation of the Pre-Petition

Agreements or this Order at any time," and "all other matters and proceedings arising in

or related to the Debtors' bankruptcy cases."  The Current Lenders have actively

participated in the case, monitoring their loans and collateral and joining as a proponent

in the Plan process.  They have incurred substantial legal and other fees in the process.

Furthermore, the debtors have regularly reimbursed Wilmington's legal and

financial advisory fees and expenses pursuant to paragraph 10 of the FCCO.  The

Disclosure Statement revealed:

> Wilmington has incurred fees and expenses of counsel and
> financial advisors in connection with these Cases.  Under the Final C/C
> Order entered by the Court, Wilmington is entitled to have these fees and
> expenses paid directly by the Estates as part of adequate protection for use
> of the Current Lenders' collateral, including cash collateral.  The Plan
> Settlement requires that the fees of the professionals representing
> Wilmington in these Cases that have been incurred but not yet paid be
> paid prior to the Effective Date of the Plan.[15]

(Disclosure Statement, at 6-7; accord 12/19 Tr., at 30; Transcript of hearing, held Dec.

21, 2007, at 39)(ECF Doc. # 602).)

The Reimbursement Rights are obviously valuable to whoever holds the secured

debt during the case, and anyone who reads paragraph 10 of the FCCO would see that.[16]

In addition, and but for the proposed settlement under the Plan, the Current Lenders

would be defending the Adversary Proceeding instead of watching from the sidelines.

Moreover, the Original Lenders never objected to the reimbursement of Wilmington, as

agent for the Current Lenders, or to the quoted passage in the Disclosure Statement.

They nevertheless contend that the parties to each Transfer Agreement intended that the

Original Lender would keep the Reimbursement Rights.  The language in the Transfer

Agreements and the parties' course of conduct belie that argument, and the Original

---

[15]    The Disclosure Statement estimated that the estates would have to reimburse Wilmington an
additional $450,000 for professional fees incurred in November and December 2007.  (Disclosure
Statement, at 31 n. 13.)

[16]    The Original Lenders discuss and quote from Chadwick-BaRoss, Inc. v. Martin Marietta Corp.,
483 A.2d 711 (Me. 1984) to support their argument that the Reimbursement Rights were not assigned
because they "can only benefit the defendants in the Adversary Proceeding "  (Original Lenders' Memo, at
10-11.)  As stated in the text, the premise of this argument is incorrect.

Lenders have not offered any credible evidence to support it.  Accordingly, the language

in the Transfer Agreements encompasses the assignment of the Reimbursement Rights.

### 2.      The FCCO

The Original Lenders next turn to the FCCO.  Paragraph 22 gave the Committee

the right to challenge the Original Lenders' claims and liens, and seek damages, which it

eventually did when it commenced the Adversary Proceeding.  Paragraph 22 also

contained a reservation of rights: "[t]he foregoing is without prejudice to any and all of

the Lender Parties' legal and equitable claims, counterclaims, defenses and/or rights of

offset and setoff in response to any such Challenge, all of which are reserved."  The

Original Lenders contend that the Reimbursement Rights are counterclaims that were

preserved by paragraph 22.[17]  (Original Lenders' Memo, at 2 n.3.)

Even the Original Lenders must concede that they unquestionably transferred at

least some counterclaims.  The Transferred Rights included claims and causes of action

arising under the "Credit Documents."  These claims and causes of action included

potential counterclaims, whether permissive or compulsory, that the Original Lenders

could have asserted in litigation brought by the Committee.  They can no longer assert

counterclaims that arose under the Credit Documents because the counterclaims now

belong to the Current Lenders.  Paragraph 22 did not preserve these counterclaims for the

Original Lenders, and they fail to explain why I should read paragraph 22 to preserve

some but not all counterclaims, or how I should determine which ones stayed and which

---

[17]      The Original Lenders also refer to paragraph 22's preservation of defenses, but the
Reimbursement Rights have nothing to do with defenses except for possible setoffs.

ones went.  In short, paragraph 22 of the FCCO does not provide any insight into the meaning of the Transfer Agreements.

### 3.    Future Rights

Lastly, the Original Lenders contend that the Reimbursement Rights were future rights at the time of the transfers that could not be assigned under applicable non-bankruptcy law.[18]  This misstates the facts and the law.  "[A]n assignment of a right to payment expected to arise out of an existing employment or other continuing business relationship is effective in the same way as an assignment of an existing right." RESTATEMENT (SECOND) OF CONTRACTS § 321(1) (1981); accord Rockmore v. Lehman, 129 F.2d 892, 892 (2d Cir. 1942)(recognizing that rights that arise from definite contractual obligations may be assigned); S.E.C. v. Credit Bancorp, Ltd., 138 F.Supp.2d 512, 537-38 (S.D.N.Y. 2001)("[W]here there is a contract in place governing the rights held by the assignor, even where those rights are conditional or contingent, a valid assignment may be effectuated."), rev'd on other grounds, 297 F.3d 127 (2d Cir. 2002); Leon v. Martinez, 638 N.E.2d 511, 514 n.1 (N.Y. 1994)("An assignment may properly relate to a future or conditional right which is adequately identified…").  A contingent right under an existing contract is, therefore, assignable.

In contrast, "a purported assignment of a right expected to arise under a contract not in existence operates only as a promise to assign the right when it arises and as a power to enforce it."  RESTATEMENT (SECOND) OF CONTRACTS § 321(2)(emphasis added).  The assignment of a future right nevertheless grants the assignee equitable title

---

[18]    New York law governs all of the Transfer Agreements, except one.  North Carolina law governs the BOA Transfer Agreement.  Neither side has identified a conflict.

with rights superior to the assignor's, and the assignee can demand performance from the obligor. JOSEPH M. PERILLO, CALAMARI & PERILLO ON CONTRACTS § 18.9, at 703 (5th ed. 2003); Speelman v. Pascal, 178 N.E.2d 723, 725 (N.Y. 1961)(where there was no presently enforceable or existing chose in action at the time of the assignment, but the possibility existed and the parties expected it to ripen into reality which it did, the assignment created an equitable title which the courts would enforce). In short, a future right is also assignable, and may be enforced in a court of equity.

Saint John Marine Co. v. United States, 92 F.3d 39 (2d Cir. 1996), the Original Lenders' principal authority on this point, did not hold to the contrary, to wit, that the assignment of a future right is unenforceable. There, the plaintiff, a vessel owner, entered into a time charter with Afram. The time charter included a clause that granted the plaintiff a lien in subfreights to secure the payment of Afram's obligations. On the same day, Afram entered into a subvoyage charter with the Government. The subvoyage charter would eventually generate subfreights payable to Afram. After Afram defaulted under the time charter, the plaintiff notified the Government of the default and insisted that it pay the subfreights to the plaintiff in accordance with its lien. Instead, the Government paid the subfreights to Afram, and the plaintiff sued the Government to recover the sums owed by Afram. Id., at 41-42.

The issue was whether the plaintiff's lien was an assignment of a claim against the United States barred by the Anti-Assignment Act, 31 U.S.C. § 3727. The Court stated that the lien was inchoate until the vessel owner gave notice to the subvoyage charterer, and could be extinguished before then if the subvoyage charterer paid the subfreight to the charterer prior to receiving notice of the lien. Id., at 47. Turning to

section 321 of the Restatement (Second) of Contracts, the Court remarked that the

provision of the charter that created the lien was a conditional assignment of the right to

receive subfreights if and when (1) Afram entered into a subvoyage charter, (2) the

subfreights became due and collectible, and (3) the sums due under the charter also

became due.  Id., at 47.  The Court ruled that the lien on subfreights did not effect an

assignment at the time it was created.  Id.

The Court nonetheless concluded that the lien eventually effected an assignment

of an existing claim against the Government.  Id.  Since the assignment occurred by

operation of law, it was not subject to the Anti-Assignment Act.  Id., at 47-48.

Accordingly, the Court affirmed the District Court, enforced the lien against the

Government, and required the Government to pay the corresponding portion of the

subfreight to the plaintiff after it had paid it Afram.  Saint John Marine did not hold that

future rights could not be assigned.

In addition, Saint John Marine dealt with the assignment of a claim for security

purposes.  The lien was inchoate until the collateral (the subfreights) and Afram's debt

existed, and the lien did not assign anything until then.  In contrast, this case involves the

absolute assignment of a right to reimbursement under the FCCO.  As stated earlier, the

right to payment under a written indemnification contract arises when the indemnification

agreement is executed.  Manville Forest Prods. Corp., 209 F.3d at 129; Houbigant, Inc. v.

ACB Mercantile, Inc. (In re Houbigant, Inc.), 188 B.R. 347, 358-59 (Bankr. S.D.N.Y.

1995)("[A] contractual indemnification claim exists as a contingent claim against the

indemnitor as of the date the indemnification agreement is executed.").  The

Reimbursement Rights, though still contingent, existed at the time of the Transfer

Agreements, and were assignable.

**B.    The VSI Guaranty**

The foregoing resolves the scope of the assignment, but leaves one open question.

The VSI Guaranty was never assigned.  Sovereign contends that FCCO also granted

Reimbursement Rights to Sovereign in its capacity as the holder of the VSI Guaranty, a

capacity it never relinquished.  The Plan Proponents counter that the VSI Guaranty was

unsecured, the adequate protection granted under the FCCO did not "protect" unsecured

creditors, and the debt guarantied by the VSI Guaranty was satisfied in August 2007.

Sovereign's evidence does not support a finding that the VSI Guaranty was

secured by the Sovereign Joinder.  The Sovereign Joinder did not identify any specific

loan or financial accommodation.  Nevertheless, it was dated the same day as the Eighth

Amendment and the Sovereign Note, which implies that the Sovereign Joinder was

intended to secure the Sovereign Note.  Furthermore, the language used in the

"Background" section was forward-looking ("Sovereign has agreed to provide financial

accommodations to the Borrower ").  This language refers to contemporaneous or

prospective financial accommodations, not two-year old loans to affiliates.  Sovereign did

not adduce any evidence at the confirmation hearing that the parties to the Sovereign

Joinder also intended to secure the VSI Guaranty.  For that matter, Sovereign has not

explained why the parties would not have secured the VSI Guaranty in the January 2006

Agreement if that was their intent.  Accordingly, I find that the VSI Guaranty was

unsecured.

I also find that the Reimbursement Rights did not extend to Sovereign in its capacity as holder of the VSI Guaranty.  At the outset, the FCCO did not refer to the VSI Guaranty.  The FCCO recited a litany of loans and financial accommodations that added up to $161,945,000 of "Pre-Petition Obligations."  (FCCO, at 2-6.)  As to Sovereign, the FCCO mentioned only the Consignment Agreement, as amended on July 7, 2006, and the loan advanced by Sovereign to allow MFS to purchase the 50,760 fine troy ounces of gold.  (Id., at 2-3.)  The parties were focused solely on the $33 million secured debt.

Furthermore, the FCCO did not grant any rights to unsecured creditors.  The FCCO says:  "Collateral Agent and Lenders are willing to consent to Debtors' use of the Pre-Petition Collateral and Cash Collateral only upon the conditions contained in this Order . . . ."  (Id., at 6.)  In other words, the adequate protection was granted in exchange for the Original Lenders' agreement to let the debtors use their collateral.  If they did not have any collateral, they did not have an interest in property of the estate to protect, and did not get adequate protection.  To the extent Sovereign suggests that the parties intended through the FCCO to grant adequate protection to Sovereign for its unsecured claim, it has failed to adduce supporting evidence.

Accordingly, the objections by the Original Lenders and Sovereign as holder of the VSI Guaranty are overruled.  The Court has considered the other arguments that they made, and concludes that they lack merit.  The foregoing constitutes the Court's findings of fact and conclusions of law.  The parties are directed to schedule a hearing to determine if there are any other confirmation objections outstanding, and if not, to

consider the terms of any proposed confirmation order that should be drafted and

circulated before then.

So ordered.

Dated: New York, New York
April 9, 2008

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
Chief United States Bankruptcy Court